**Opinion issued February 11, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00227-CR

————————————

**JEREMY DION WASHINGTON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from County Criminal Court at Law No. 8**
**Harris County, Texas**
**Trial Court Case No. 1862655**

---

# O P I N I O N

A jury convicted Jeremy Dion Washington of the offense of unlawfully

carrying a handgun while a member of a criminal street gang.[1] The court assessed

---

[1]   *See* TEX. PENAL CODE ANN. §§ 46.02 (a-1)(2)(c) (West Supp. 2015) (stating that it is unlawful for a person to "intentionally, knowingly, or recklessly carr[y] on or about his or her person a handgun in a motor vehicle" if he or she is "a member of a criminal street gang, as defined by Section 71.01").

his punishment at one year's confinement in county jail, then suspended the sentence and placed Washington on community supervision for two years. In two issues, Washington argues that the trial court erred by: (1) allowing an officer to testify as an expert witness on the issue of gang membership in violation of Texas Rule of Evidence 702, and (2) admitting photographs of various gang symbols because those exhibits were not properly authenticated. Finding no reversible error, we affirm the trial court's judgment.

**Background**

Officer Sullivan testified at Washington's trial that he was able to identify local criminal street gangs and their members based primarily on the "street experience" he gained as a member of the Houston Police Department Gang Division's Crime Reduction Unit, as well as training he had received regarding the identification of gang members. Over objection, the trial court allowed Sullivan to offer expert testimony on the issue of "gang membership" and "whether somebody can be identified as a gang member by specific criteria."

Sullivan testified that he stopped Washington's car during a routine traffic stop in October 2011. Upon approaching the vehicle, he noticed that Washington's clothing, his car, and a bandana in the car's center console, were all a shade of blue that he believed to be associated with the 52 Hoovers-Crips, a criminal street gang. During the traffic stop, Sullivan asked Washington whether he was a gang member.

Washington responded that he was a "former 52 Hoovers-Crips." At Sullivan's request, Washington removed his shirt and showed Sullivan the numerous tattoos that covered his chest, back, shoulder, and abdomen. Sullivan recognized some of the tattoos as being symbols of the 52 Hoovers-Crips. In particular, Officer Sullivan noted that Washington had a large tattoo of a pair of dice with "5" and "2" on his upper left shoulder, and a large tattoo of the numbers "5" and "2" prominently displayed on his stomach. At the conclusion of the traffic stop, Washington left the scene.

Sullivan subsequently searched for Washington in HPD's "Gang Tracker" database, but could not locate an entry for him. At trial, Sullivan explained that Gang Tracker is a database program used by HPD to identify and track former and active gang members by documenting their interactions with law enforcement. He testified that an individual must be identified as a gang member based on at least two of eight characteristics in order to be entered into the database. Sullivan identified five of the eight characteristics used by Gang Tracker (gang colors, tattoos, self-admission, associating with documented gang members, and information from confidential and reliable witnesses) and testified that he needed to consult the program in order to list the remaining three criteria.

Based on Washington's admitted affiliation with the criminal street gang and his gang-related tattoos, Sullivan entered Washington's information into Gang

Tracker, along with photographs that he had taken of Washington, his car, and his tattoos. Sullivan's database entry noted that Washington was a "former" member of the 52 Hoovers-Crips.

Six months after Washington's encounter with Officer Sullivan, Officer C. Ferzenni and his partner, Officer R. Rivas, pulled Washington over for another routine traffic stop. When the officers approached Washington's vehicle, Rivas noticed the handle of a pistol between the driver's seat and the center console. At that point, Ferzenni removed Washington from the vehicle, frisked him, and placed him in the backseat of the patrol car. Washington explained to the officers that he was a security guard and he used the gun for his work.

Ferzinni, like Sullivan, is a member of the Gang Division's Crime Reduction Unit and was also allowed to testify as an expert regarding "whether somebody can be identified as a gang member by specific criteria." Ferzenni testified that because Washington was not wearing a shirt during the traffic stop, he observed some of the same tattoos that Sullivan had documented several months earlier, including the large "5" and "2" on Washington's stomach and the dice on Washington's left shoulder. He explained that these images are associated with the 52 Hoovers-Crips and linked Washington to the criminal organization. Ferzenni also testified that Washington's car was painted blue, the predominant color used by the 52 Hoovers-Crips in Houston. Based on his observations, Ferzenni searched for Washington in

Gang Tracker and discovered that Washington's affiliation with the Hoovers-Crips had already been documented. Ferzenni arrested Washington for unlawfully carrying a handgun while a member of a criminal street gang.

At trial, Sergeant C. Ponder with HPD's gang division gave expert testimony regarding the identification of 52 Hoovers-Crips members and the history and origin of the criminal street gang. Ponder testified that the colors blue and orange are commonly associated with the 52 Hoovers-Crips, but the predominant color used in Houston is blue.

Sergeant Ponder took several photographs of Washington's tattoos the day of trial which were admitted without objection. Using those photographs, Ponder gave a detailed description of some of Washington's gang-tattoos and explained the meaning behind the various symbols and imagery used in those tattoos, including the pair of dice with the numbers "5" and "2" and the large "5" and "2" on Washington's stomach with the acronym "HCC" inside. Ponder explained that "HCC" stands for "Hoovers-Crips Criminal." Ponder also described the large Astro's logo with an "H" in front of it and a broken five-point star. According to Ponder, the "H" indicated that Washington was from Houston, and the broken five-point star was intended to show disrespect to another group of gangs known as the People Nation. Ponder further explained that the Crips and Bloods are rival gangs and Crips, who are not allowed to use the letter "B," will usually put an "X" inside

5

the letter, break it, or turn it upside down. In this case, Washington had several tattoos with "X"s inside the letter "B."

When asked if anyone would get a gang tattoo while not being in a gang, Ponder said such a decision would "definitely not [be] smart," since they could be targeted by rival gangs, the gang itself, or the police. Ponder also explained that individuals who want to leave or quit a gang can have their tattoos removed, covered up, or altered by a tattoo artist and that the City of Houston has programs to have gang tattoos removed for free. Based on Washington's open display of his tattoos, the custom paint job on his car, and the blue bandana found in his car, it was Sergeant Ponder's opinion that Washington was an active member of the 52 Hoover-Crips at the time of his arrest.

Washington testified that he was a former member of the 52 Hoovers-Crips and that he had not associated with any known gang members or engaged in any criminal activities since he had graduated from high school five years earlier. According to Washington, he got the tattoos when he was a 15 year-old high school freshman because "everybody was doing it" and he did not know the significance of the dice tattoo at that time. Washington expressed a desire to have his tattoos removed and claimed that he did not know that tattoos could be removed or altered prior to charges being filed in this case. When asked what the numbers "5" and "2" meant to him, Washington replied it was his bus route, and that he had those numbers

6

tattooed on his stomach because "[t]hat's the side of town we were staying on, you know."

**Expert Testimony**

In his first issue, Washington argues that the trial court erred by allowing Officer Sullivan to testify as an expert witness on the issue of criminal street gang membership because the State failed to show that the testimony was reliable. *See* TEX. R. EVID. 702. According to Washington, Sullivan's testimony was unreliable because he was unable to list all of the criteria used to identify gang members without referring to Gang Tracker and, as a result, Washington was unable to properly vet Sullivan's methodology.

**A.  Standard of Review and Applicable Law**

We review the admission of expert opinion testimony for an abuse of discretion. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000) (citing *Prystash v. State*, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999)); *Hernandez v. State*, 53 S.W.3d 742, 750 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). We consider the trial court's ruling in light of the evidence presented at the time of its ruling, and we will uphold the ruling if it lies within the zone of reasonable disagreement. *See Weatherred*, 15 S.W.3d at 542. A trial court enjoys wide latitude in determining whether expert testimony is admissible. *Hernandez*, 53 S.W.3d at 750.

Rule 702 provides that an expert may testify if the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702; *Duckett v. State*, 797 S.W.2d 906, 914 (Tex. Crim. App. 1990), *disapproved on other grounds*, *Cohn v. State*, 849 S.W.2d 817 (Tex. Crim. App. 1993) (noting that to be admissible, expert testimony must "assist" trier of fact). A witness may be qualified as an expert to give such testimony on the basis of his or her knowledge, skill, experience, training, or education. TEX. R. EVID. 702.

"Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case." *Rodgers v. State*, 205 S.W.3d 525, 527–28 (Tex. Crim. App. 2006). Indeed, "expert testimony does not have to be based upon science at all; by its terms, Rule 702, by applying to 'technical or other specialized knowledge,' permits even nonscientific expert testimony." *Morris v. State*, 361 S.W.3d 649, 654 (Tex. Crim. App. 2011). The reliability of such evidence may be established by showing that the field of expertise involved is legitimate, the subject matter of the expert's testimony is within the scope of that field, and the expert's testimony properly relies on or utilizes the principals involved in that field. *See Weatherred*, 15 S.W.3d at 542. The behavior of gangs and gang members is a generally accepted area of expert testimony which

involves the gaining of specialized knowledge through experience or personal research. *See Morris*, 361 S.W.3d at 656.

The erroneous admission of expert testimony constitutes non-constitutional error. *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Non-constitutional error requires reversal only if it affects the substantial rights of the accused. *See* Tex. R. App. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We will not overturn a criminal conviction for non-constitutional error if, after examining the record, we have fair assurance that the error did not influence the jury, or had but a slight effect. *Barshaw*, 342 S.W.3d at 93. Error in the admission of evidence may be rendered harmless when substantially the same evidence is admitted elsewhere without objection. *See Leday v. State*, 983 S.W.2d 713, 717–18 (Tex. Crim. App. 1998).

**B.    Analysis of Admission of Expert Testimony**

Washington argues that the trial court abused its discretion when it allowed Sullivan to opine on the issue of Washington's gang membership because Sullivan, who was unable to properly articulate the methodology he used to identify

Washington as a street gang member, did not demonstrate that his testimony was sufficiently reliable.

Officer Sullivan testified about his training and experience in the area of Houston gangs. His testimony was limited to the field in which he could claim expertise, gang membership—specifically the identification of members of the 52 Hoovers-Crips—which is generally accepted as a legitimate field of expertise. *See Morris*, 361 S.W.3d at 656 & n.31 (citing *Ortiz v. State*, 93 S.W.3d 79, 86 (Tex. Crim. App. 2002) and *United States v. Padilla*, 387 F.3d 1087, 1094 (9th Cir. 2004) (concluding detective's expert testimony based on his "extensive experience with Los Angeles street gangs, and the Cuatro Flats gang in particular" was reliable)). Sullivan's testimony that he determined that Washington was a member or former member of the 52 Hoovers-Crips, and thus eligible for inclusion in Gang Tracker when he encountered him in October 2011, is within the scope of that field. Officer Sullivan also explained that he identified Washington as a member or former member of the 52 Hoovers-Crips based primarily on two factors—Washington's self-admission and his gang-related tattoos. Both self-admission and gang-related tattoos are factors regularly relied upon by law enforcement to identify gang members, as evidenced by Sullivan's testimony that these are two of eight factors used to evaluate someone's eligibility for inclusion in HPD's Gang Tracker database program. The limited testimony establishes that Officer Sullivan's expert testimony

meets the requirements for reliability. *Weatherred*, 15 S.W.3d at 542; *see generally Padilla*, 387 F.3d at 1094 (concluding detective's expert testimony based on his street experience was reliable); *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (holding that "*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to [expert testimony on gang membership], whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it"). Given the wide latitude trial courts have in determining whether expert testimony is admissible, we cannot say that the court's ruling allowing Sullivan to opine as an expert on the issue of gang membership lies outside the zone of reasonable disagreement. *See Weatherred*, 15 S.W.3d at 542; *Hernandez*, 53 S.W.3d at 750.

We further note that Sullivan's testimony that Washington's tattoos signified his membership in the 52 Hoovers-Crips was cumulative of the testimony of the other officers in this case. In particular, Sergeant Ponder opined that Washington was a criminal street gang member at the time of his arrest based on Washington's open display of his gang-related tattoos and gang colors when he was stopped by Officers Ferzenni and Rivas. Washington is not challenging Ponder's expert testimony on appeal. *See Leday*, 983 S.W.2d at 717–18 (noting that erroneous admission of evidence is rendered harmless when equivalent evidence is admitted elsewhere without objection).

We overrule Washington's first issue.

## Admission of Evidence

In his second issue, Washington argues that the trial court abused its discretion by admitting still images containing symbols purportedly associated with the 52 Hoovers-Crips (State's Exhibits 24, 25, and 26) into evidence during Sergeant Ponder's testimony. According to Washington, State's Exhibits 24, 25, and 26 were not properly authenticated because Ponder demonstrated no personal knowledge of where these images came from and the State offered no explanation as to their origins.

## A.    Standard of Review and Applicable Law

We review a trial court's decision to admit evidence over an authentication objection under an abuse of discretion standard. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). If the trial court's ruling is at least within the zone of reasonable disagreement, the appellate court will not interfere. *Id.*

The requirement of authentication is a condition precedent to the admissibility of evidence and is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. TEX. R. EVID. 901(a). In a jury trial, the preliminary question for the trial court to decide is simply whether the proponent of the proffered evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence is authentic. *Tienda*, 358 S.W.3d at 638; *see*

*also Manuel v. State*, 357 S.W.3d 66, 74 (Tex. App.—Tyler 2011, pet. ref'd) ("The proponent must only produce sufficient evidence that a reasonable fact finder could properly find genuineness.").

**B.    Analysis**

Prior to the admission of State's Exhibits 24, 25 and 26, Sergeant Ponder testified that he was a patrol sergeant with HPD and had been with the department for fifteen years. Ponder testified that he had been assigned to HPD's Gang Division in the Fondren District for ten of those fifteen years, during which time he handled "anything that's gang-related" in that area, "from robbery to burglary to a simple graffiti case." Although he had received over 100 hours of gang-related training while with HPD, Sergeant Ponder testified that his "street experience" was "much more valuable." Ponder explained that he acquired most of his gang-related knowledge by "talking to gang members on the streets and learning from them[,] learning their tattoos and symbols or terminology, what they say, what it means." According to Ponder, most of the gang members he encountered were proud of their gang-affiliation and explained the meaning behind their tattoos and colors.

Ponder testified that the 52 Hoovers-Crips gang is a criminal street gang that he began noticing in Houston around 2000. According to Ponder, the gang is involved in "all types of crimes" in the Houston area, "[a]nywhere from theft to burglary to robbery to drug possession, drug delivery, [and] homicides." Ponder

testified that the colors blue and orange are commonly associated with the 52 Hoovers-Crips, but the predominant color used in Houston is blue.

Sergeant Ponder took several photographs of Washington's tattoos the day of trial and, using those photographs, Ponder gave a detailed description of some of Washington's gang-tattoos and explained the meaning behind the various symbols and imagery used in those tattoos and their connection to the gang culture. When asked if he commonly used the internet to educate himself "as far as signs or symbols gangs are currently using," Ponder responded that he did, but that he relied mostly on the signs and symbols he saw being used locally. At that point, the State showed Ponder State's exhibits 24, 25 and 26. Ponder testified that he was familiar with the images in those exhibits, which are images commonly associated with the Hoovers-Crips. According to Ponder, the exhibits fairly and accurately represented images regularly used by the Hoovers-Crips.

Washington contends that Sergeant Ponder could not offer credible testimony as to whether the exhibits were fair and accurate depictions of what they purported to be because he lacked personal knowledge of when and where the photographs were made and there was nothing in the record to indicate the source of these photographs. The lack of testimony regarding the source of these exhibits is not dispositive of their admissibility; however, particularly when the proponent is using them for illustrative purposes and is not attempting to link the exhibits to the

14

defendant. *See Hartsock v. State*, 322 S.W.3d 775, 779–80 (Tex. App.—Fort Worth 2010, no pet.) (finding trial court did not abuse its discretion in allowing videotape of eyes with and without nystagmus into evidence despite witness not knowing who took video, since purpose was to illustrate nystagmus).

Here, Sergeant Ponder's expert testimony regarding his experience with the 52 Hoovers-Crips and the signs, symbols, and colors used by the gang is sufficient to support a reasonable jury determination that the exhibits are what Ponder claimed they were—"images that the Hoovers-Crips regularly used." *See Tienda*, 358 S.W.3d at 638; *Manuel*, 357 S.W.3d at 74. In light of Ponder's testimony, we cannot say that the trial court's decision to admit State's exhibits 24, 25 and 26 was an abuse of discretion. *See Tienda*, 358 S.W.3d at 638.

We overrule Washington's second issue.

## Conclusion

We affirm the trial court's judgment.


Russell Lloyd
Justice

Panel consists of Justices Keyes, Massengale, and Lloyd.
Publish.   TEX. R. APP. P. 47.2(b).