# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00506-CR

---

**Freddy Uceta, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 426TH DISTRICT COURT OF BELL COUNTY
### NO. 76560, THE HONORABLE FANCY H. JEZEK, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury convicted Freddy Uceta of aggravated robbery, and the district court assessed punishment at forty-five years' imprisonment. *See* Tex. Penal Code § 29.03(a)(2). On appeal, Uceta contends that the district court abused its discretion by admitting "backdoor" hearsay testimony from a police officer who investigated the offense. We will affirm the district court's judgment of conviction.

## BACKGROUND

Evidence at trial showed that the robbery victim was an eighty-year-old man who owned businesses with multiple stores in three central Texas cities. On the day of the offense in February 2016, he collected cash and checks from his stores and drove to another one of his businesses in Temple. As he was getting out of his truck, a man approached him from behind.

The man pointed a gun at him, demanded the "bags of money," grabbed them, and fled in a black car. The victim returned to his truck and embarked on a high-speed chase of the car but eventually lost sight of it. The victim testified that the robber was a slender black man, that he did not "get a good look at" the robber's face, and that the robber had been in a black car. The victim did not know what type of car it was, but an eyewitness to the robbery saw the car and later shared that information with the victim. The victim met with police and gave a "Voluntary Statement" to them describing the robber's vehicle as "a black in color Nissan M[u]rano style vehicle." The victim also described the route that he drove while chasing the car and recounted that he lost sight of it in the area of 5th Street "by the railroad tracks."

**Reports of offense to police**

The jury heard descriptions of the robber's car and of the area where the chase occurred in recordings of two 911 calls admitted into evidence without objection. The first call was from the eyewitness, a man who lived near the robbery site and was mowing his lawn when he saw the offense. Within the first three minutes of the call, the eyewitness identified the robber's vehicle multiple times: "[Victim] took off with his truck chasing him, he's in a black Nissan SUV"; "The guy that robbed him is in a Nissan SUV, black"; and "The perp is in a Nissan. . . . black, yeah SUV."

The second call was from the victim's wife. She told the 911 operator that her husband called her stating that "he was chasing a guy that just stole from him." She identified her husband's vehicle as a "white Ford F-150 pickup truck." She also reported that "when he called, he said he was on South 5th Street road in Temple." Toward the end of the call, the wife saw her husband approaching in his truck. She put him on the phone, but he spoke only briefly

2

with the 911 operator because police arrived soon afterward. The victim told the 911 operator that a man robbed him at gunpoint and that "[he] chased him all the way down to the railroad tracks and [he] lost him."

**Police investigation**

After the 911 calls, the jury heard from Officer Keith Smith, who testified that he was alerted to respond from a 911 call and that he met with the victim and his wife at the scene. Officer Smith further testified that the victim told him what type of vehicle the robber fled in, and as a result of what the victim told him, police looked for "a dark-colored Nissan Murano type vehicle." Other officers with the Temple Police Department responded while Officer Smith was meeting with the victim, including Temple Police Detective Brandon Mathiews.

Detective Mathiews testified that when he arrived at the scene, he overheard the victim talking to other officers about what had happened to him, including a description of the vehicle as a dark-colored Nissan Murano and the route that the victim drove while pursuing the robber. Detective Mathiews testified that he went to the area of south 5th Street and west Avenue F where the victim last saw the vehicle. That area of south 5th Street—including the roads, businesses, and people in that general location—was "very familiar" to Detective Mathiews because of his six years as a patrol officer specifically assigned to that part of Temple.

Based on his years of experience on patrol, the area that specifically came to Detective Mathiew's mind was "the bridge on South First and Third [Streets], at the interchange as it goes over the railroad tracks." He recalled that there was access to a dirt road beneath the bridge, and he said it was "a common route that people would take when I was on patrol and they would get in pursuits," where people would run to when he was after them. Using a map and a

3

laser pointer, Detective Mathiews demonstrated his route to the jury and testified that when he got to south 5th Street, he turned north and saw "a dark colored SUV stopped in the roadway on the right side of the road," which drew his attention because "it's not a highly traveled road. It was parked not near the entrance to a business or the entrance to a residence. It wasn't an area common for an employee parking for any of the businesses that were there. It was an area where a vehicle, at least immediately apparent to me, didn't have a reason to be."

**Evidence from vehicle**

Detective Mathiews approached the vehicle, which he determined was unoccupied. Once he determined that the vehicle was unoccupied, Detective Mathiews "asked for the return on the registration and looked inside to see if . . . there was anything consistent with what the victim had said was taken from him." On the floorboard of the vehicle, Detective Mathiews found two checks payable to the victim and cash reports labeled with the name of one of the victim's businesses, but the money was missing. He ran the vehicle identification number (VIN) and learned that the vehicle, a black Nissan Murano, had been reported stolen. Detective Mathiews, who is also a crime-scene officer and fingerprint expert for the Temple Police Department, impounded the vehicle and arranged for its transport to the police department for forensic examination. He obtained multiple fingerprints from various areas in the vehicle and one fingerprint from a cash receipt. He ran the fingerprints through a Texas database and matched a print on a passenger door to the known print of Marquisha Roberts.

Marquisha Roberts testified that she worked the midnight shift at a fast-food restaurant where Freddy Uceta, known to her as "Free" or "Flee,"[1] was a regular customer.

---

[1] The reporter's record has three spellings for this nickname, "Free," "Flee," and "Flea."

She stated that they flirted with one another and that he gave her his name and number on a piece of paper. She also recalled that he once drove her home from work in a black "SUV type little car." She got into the front passenger seat, in the area where her fingerprints were later found. Roberts testified that during her ride in the car, Free had a black gun in his lap. At trial, Roberts saw a photograph that had been admitted into evidence depicting the car recovered in connection with the robbery. She recognized the car as the one she had been in when Free drove her home.

After Roberts's interview, Detective Mathiews obtained Uceta's fingerprint card from the Bell County Sheriff's Department. Detective Mathiews found Uceta's fingerprints on the inside and outside of the driver's door and on the driver's side window of the Nissan Murano recovered in connection with the robbery. Detective Mathiews also found Uceta's fingerprints on a cash report discovered inside the car.

**Testimony from vehicle's owner**

Retired attorney Angus Barrett told the jury that he has a one-man business in which he cleans and details cars for resale to dealerships or wholesalers. After buying a car, Barrett updates his "title book" by noting the vehicle's year, make, model, VIN number, seller, purchase price, and date of sale. He testified that in September 2015, he obtained a 2007 black Nissan Murano, thoroughly cleaned the car's exterior and interior, and then placed it on his car lot in Temple. He estimated that the vehicle was test driven anywhere from three to twenty times. After one of those test drives, someone returned the car with the key stuck in the ignition. Barrett did not have a spare key, so he decided to leave the car unlocked until he could get a locksmith. In January 2016, Barrett noticed that the car was missing from his lot and reported it stolen to police. He identified the vehicle that Detective Mathiews found as the one that had

been stolen from his lot.  Barrett was able to confirm that it was his car by checking the VIN number.

At the conclusion of the trial, the jury convicted Uceta of aggravated robbery, and the district court assessed punishment and rendered judgment in accordance with the jury's verdict.  Uceta filed a motion for new trial that was denied by operation of law.  This appeal followed.

## DISCUSSION

**"Backdoor" hearsay complaint**

Uceta contends that the district court erred by admitting "backdoor" hearsay testimony from Officer Smith connecting the Nissan to the robbery.  He complains specifically about Officer Smith's testifying that the victim told him what type of vehicle the robber fled in, and as a result of what the victim told him, police looked for "a dark-colored Nissan Murano type vehicle."  Uceta points out that the victim was unable to identify him as the robber, and Uceta asserts that the State needed Officer Smith's testimony to link the victim's information to the vehicle from which police recovered his fingerprints.  As we have noted, the victim testified that he knew the color, but not the type, of car that was involved in the robbery.  The victim testified that he relied on information from the eyewitness—who called 911 but did not speak to police or testify at trial—to identify the type of vehicle used.  The victim then relayed that information to police.

We review a trial court's ruling on the admission of evidence under an abuse-of-discretion standard.  *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018).  We uphold the trial court's ruling unless it is outside the zone of reasonable disagreement.  *Id*.  An

evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim. App. 2016).

Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Hearsay is inadmissible except as provided by statute, the rules of evidence, or other rules prescribed under statutory authority. *Id*. R. 802. Under Rule 801(a), a "statement" necessarily includes proof of the statement, whether the proof is direct or indirect. *Head v. State*, 4 S.W.3d 258, 261 (Tex. Crim. App. 1999); *see* Tex. R. Evid. 801(a). Thus, an out-of-court "statement" need not be directly quoted to run afoul of the hearsay rules. *Head*, 4 S.W.3d at 261 (citing *Schaffer v. State*, 777 S.W.2d 111, 114 (Tex. Crim. App. 1989)). When there is an inescapable conclusion that evidence is being offered to prove statements made outside the courtroom, a party may not circumvent the hearsay prohibition through artful questioning designed to elicit hearsay indirectly. *Id*. Whether the disputed testimony violates the hearsay prohibition necessarily turns on how strongly the content of the out-of-court statement can be inferred from the context. *Id*.

"[T]estimony by an officer that he went to a certain place or performed a certain act in response to generalized 'information received' is normally not considered hearsay because the witness should be allowed to give some explanation of his behavior." *Poindexter v. State*, 153 S.W.3d 402, 408 n.21 (Tex. Crim. App. 2005), *overruled in part on other grounds by Robinson v. State*, 466 S.W.3d 166, 173 n. 32 (Tex. Crim. App. 2015); *Sandoval v. State*, 409 S.W.3d 259, 282 (Tex. App.—Austin 2013, no pet.). Further, extrajudicial statements or writings offered to show what was said, rather than for the truth of the matter stated, does not constitute hearsay. *Dinkins v. State*, 894 S.W.3d 330, 347 (Tex. Crim. App. 1995). "But details of the information received are considered hearsay." *Poindexter*, 153 S.W.3d at 408 n.21;

7

*Sandoval*, 409 S.W.3d at 282. The officer "should not be permitted to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that [he] was entitled to tell the jury the information upon which [he] acted." *Schaffer*, 777 S.W.2d at 114-15; *Sandoval*, 409 S.W.3d at 282. "The appropriate inquiry focuses on whether the 'information received' testimony is a general description of possible criminality or a specific description of the defendant's purported involvement or link to that activity." *Head*, 4 S.W.3d at 261; *Sandoval*, 409 S.W.3d at 282.

**Evidence connecting Uceta to vehicle used in robbery**

Uceta complains of the following testimony from Officer Smith about information the victim provided to him identifying the robber's vehicle:

[Prosecutor]:        All right. And did either [the victim] or someone else describe the vehicle that the armed robber - -

[Defense counsel]:   Objection. Calls for hearsay.

The Court:           Overruled.

[Prosecutor]:        Judge, may I reask the question.

The Court:           Yes.

[Prosecutor]:        Did either [the victim] or anyone there tell you what type of vehicle the armed robber had fled in?

[Officer Smith]:     [The victim] did.

[Prosecutor]:        All right. And as a result of what [the victim] told you, were you and other officers involved looking for a vehicle?

[Officer Smith]:     We were.

[Prosecutor]:        What vehicle did you go looking for?

8

[Officer Smith]:         It was -- at the time it was a dark colored Nissan Murano.

Even if there were some error in the admission of the above testimony, it would have been harmless.  *See* Tex. R. App. P. 44.2(b) (instructing that any nonconstitutional error that does not affect substantial rights must be disregarded); *Cooks v. State*, 844 S.W.2d 697, 738 (Tex. Crim. App. 1992) (holding that admission of fingerprint evidence during robbery trial was harmless given other evidence admitted at trial), *superseded on other grounds by Bell v. State*, 415 S.W.3d 278, 281 (Tex. Crim. App. 2013).  We will not overturn a criminal conviction for nonconstitutional error if, after examining the record as a whole, we have fair assurance that the error did not influence the jury, or had only a slight effect.  *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011).

Here, when Officer Smith testified and the complained-of "backdoor" hearsay evidence was admitted, the jury had already heard without objection the recording of the 911 call from the eyewitness, identifying the robber's vehicle multiple times as a black Nissan SUV. The eyewitness specifically stated, "[Victim] took off with his truck chasing him, he's in a black Nissan SUV"; "The guy that robbed him is in a Nissan SUV, black"; and "The perp is in a Nissan. . . . black, yeah SUV."  Thus, Officer Smith's testimony was not the first or only evidence that the jury received about the vehicle seen at the scene of the robbery.  *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (stating that overruled objection to evidence will not result in reversal when other such evidence was received without objection either before or after complained-of ruling); *Washington v. State*, 485 S.W.3d 633, 638-39 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (concluding that error in admission of evidence may be rendered harmless when substantially same evidence is admitted elsewhere without objection);

*see also Alexander v. State*, No. 09-05-00044-CR, 2005 Tex. App. LEXIS 10298, at *13-14 (Tex. App.—Beaumont Dec. 7, 2005, no pet.) (mem. op., not designated for publication) (noting that same testimony police sergeant offered about description of Suburban was also offered by other witnesses at trial).

Further, the evidence identifying the area in Temple where the victim lost sight of the robber's vehicle was itself sufficient for Detective Mathiews to know where to conduct a targeted search. In a 911 call admitted without objection, the victim's wife reported the location where the victim was chasing the robber: "[W]hen he called, he said he was on South 5th Street road in Temple." The victim also told the 911 operator that he chased the man who robbed him at gunpoint "all the way down to the railroad tracks and I lost him." That information from the day of the robbery is consistent with the victim's testimony at trial about the area where he lost sight of the robber's vehicle, specifically, in the area of 5th Street "by the railroad tracks."

Detective Mathiews overheard the victim talking to other officers at the scene about the route that the victim drove while pursuing the robber. That area of south 5th Street was "very familiar" to Detective Mathiews because of his many years as a patrol officer assigned to that part of Temple. He specifically thought about a bridge on south 1st and 3rd Streets, an overpass above railroad tracks, with access to a dirt road beneath the bridge. It was "a common route that people would take when [he] was on patrol and they would get in pursuits."

When Detective Mathiews arrived at south 5th Street, he turned north and saw "a dark colored SUV stopped in the roadway on the right side of the road," which drew his attention because "it's not a highly traveled road. It was parked not near the entrance to a business or the entrance to a residence. It wasn't an area common for an employee parking for any of the businesses that were there. It was an area where a vehicle, at least immediately apparent to me,

10

didn't have a reason to be." Some of the victim's stolen property was discovered in that abandoned car, a black Nissan Murano, which had Uceta's fingerprints on the driver's side door and window and on a cash report found on the floorboard. Thus, information about the area where the victim lost sight of the robber's vehicle led Detective Mathiews to search an area in Temple commonly used to evade police during pursuits. On arrival at that area, he saw only one vehicle, which had no apparent reason to be there.

We conclude that any alleged error in the admission of Officer Smith's testimony about the specific type of car involved in the robbery was harmless, given the evidence that the jury heard before and after his testimony identifying the type of car used in the offense and where it was last seen and linking it to the robbery. *See Cooks*, 844 S.W.2d at 738 (concluding that any error in admission of fingerprint evidence from car believed to have been used in robbery was harmless given subsequent testimony linking car to robbery). After examining the record as a whole, we have fair assurance that the complained-of error in the admission of Officer Smith's testimony did not influence the jury, or did so only slightly. *See* Tex. R. App. P. 44.2(b); *Barshaw*, 342 S.W.3d at 93. Accordingly, we overrule Uceta's appellate issue.

## CONCLUSION

We affirm the district court's judgment of conviction.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Kelly and Smith

Affirmed

Filed: November 5, 2019

Do Not Publish

11