# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00401-CR

---

### Elizabeth Ann Mills, Appellant

### v.

### The State of Texas, Appellee

---

### FROM THE 424TH DISTRICT COURT OF LLANO COUNTY
### NO. CR7960, THE HONORABLE EVAN C. STUBBS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Following a bench trial, the district court convicted appellant Elizabeth Ann Mills of cruelty to non-livestock animals, specifically her dog, and assessed punishment at three years' imprisonment. *See* Tex. Penal Code § 42.092(b)(1), (c-1). The district court suspended imposition of the sentence and placed Mills on community supervision for four years. In two issues on appeal, Mills asserts that the district court abused its discretion in admitting expert testimony regarding the length of time it took for the dog's injury to occur and that the evidence is insufficient to support her conviction. We will affirm the district court's judgment.

## BACKGROUND

At trial, Mills's next-door neighbor, Eddie Walker, testified that he would sometimes provide food and water to Mills's dog over a chain-link fence that separated the two

properties. One day in October 2019, when Walker walked up to the fence to give the dog some water from a hose, he saw a "gouge across its throat" when the dog stood up. Walker recounted,

> It just looked like it was cut from side to side. It was just bad. And then I laid the hose down, reached over the fence, and I could feel he had a collar on. And then I kept feeling and it had one of those little collars you clip together and I kept trying to undo it and I couldn't do it because it was slimy stuff there.

Walker then retrieved some wire cutters from his shed and used them to remove the collar, but he had a difficult time doing so. He explained, "I reached in. I had a hard time getting them in there and I finally got in and I still couldn't quite cut it. I kept jiggling and trying to cut it off and I finally got it cut off." Walker described the collar as "really small" and "almost like a wire." Walker suspected that "the dog grew into the collar so that little by little it was choking him." Walker notified a renter who lived on his property about the dog, and the renter took photographs of the dog and called the police. The photographs, which were admitted into evidence, showed a deep, long, and reddish gash around the front of the dog's neck.

Deputy Ashley Doran, Sergeant Investigator Janie Crumpler, and Animal Control Officer Mike Bradshaw of the Llano County Sheriff's Office responded to the call. Doran, who was a veterinary technician before beginning her career in law enforcement, testified that she had seen "approximately four" embedded-collar cases in her thirteen to fourteen years working as a veterinary technician and that this case was "[t]he worst one [she] had seen." When asked to explain how she could be sure that this was an embedded-collar case, Doran testified, "There's very distinct markings that go along with that, as well as the size of the wound and the placement of the wound." She explained, "The placement for an embedded-collar wound is going to be around the neck. Generally you're going to see most of them come around the bottom under the

2

jawline. There's not going to be as much around the top, generally speaking." Doran added that there was a "rank odor" coming from the dog that led her to believe the neck wound had become infected. Doran testified that the wound could not have gone unnoticed for an extended period of time:

> [T]here was obvious[ly] . . . some drainage going down the dog's neck already that was coming from the wound. There [were] black and brown clots around it that indicated dried blood. The flesh that was showing. I mean there was—there was quite a few things that would have led that to be known.

The officers spoke with Mills while they were on her property that day. Doran testified that Mills acknowledged that the dog belonged to her and that she fed and cared for it at least once a day. Doran opined that anyone interacting daily with the dog and providing it with a basic level of care would have seen the collar and discovered the injury, and she further opined that to let the dog continue to wear the collar after discovering the injury would cause the animal unnecessary pain and suffering.

During her interview with the officers, Mills claimed that the injury might have been caused by either the dog getting "hung in the fence" or from a harness that the dog had been wearing. Doran did not find either explanation credible based on her experience. She testified that although it was possible the dog had been wearing a harness at some point in time, she did not believe it caused the dog's injury. She explained, "The way a harness fits is it's going to go closer to the back of the neck and it's going to come down across the chest. It's not going to be under the bottom of the jawline." As for the fence causing the injury, Doran testified, "If it had hung on a fence simply by a collar, there wouldn't have been an injury to this extreme. If it had been hung up by the skin, there would have been a jagged laceration."

3

Mills told the officers that she discovered the injury to the dog approximately two weeks earlier and that at that time, she began treating the wound with "Vetericyn from Tractor Supply," which Doran characterized as a "spray that you can get to treat small abrasions [or] minor wounds." Doran did not believe that Vetericyn would have been sufficient to treat this injury.

Investigator Crumpler also testified at trial and explained that based on her experience, she did not believe the fence could have caused the dog's injury. Crumpler elaborated that for the dog to have been caught under the chain link fence and injured on the underside of its neck, the dog would have had to have been positioned "all the way around" and "upside down" underneath the fence, with the dog's neck moving around sufficiently to create a deep gash in the dog's neck. Crumpler also testified that Mills admitted to the officers that there had been a collar on the dog's neck at one point in time, but Mills did not know what happened to it.

Crumpler testified that she had worked three embedded-collar cases and that this one was "at the top" in terms of the severity of the injury, with a neck wound that was "very deep." Crumpler concluded that the injury had been caused by placing a collar around the dog's neck and not adjusting the size of the collar as the dog grew so that the collar became embedded in the dog's neck. Crumpler agreed that this kind of injury does not occur rapidly but rather takes a long time to occur.

After speaking with Mills, Crumpler and Officer Bradshaw applied for a warrant to seize the dog. After they obtained the warrant, the dog was transported to the Burnet Veterinary Clinic, where it was treated by Dr. Laura Atkinson Goad, a veterinarian. Dr. Goad testified that she had seen "[p]robably two to three" embedded-collar cases and that this one was

4

"the most severe." She explained that the injury was preventable and that if it had been "caught early [it] would be [a] very minor injury more equivalent to, like, a superficial abrasion or even just a small amount of hair loss with, like, a rash." When asked to describe the wound when she first examined the dog, Goad testified,

> It was a very deep circumferential wound, most severe what we call the ventral aspect of [the] neck, which is, like, where we would wear a necklace. It pretty much extended all the way around the ventral aspect of the neck and then there was more superficial wounds on the backside of the dog's neck. It extended very—the wound was very deep through both skin all the way through the subcutaneous tissue and extending into the muscles of the neck.

Goad photographed the injury, and copies of those photos, which showed the injury in more graphic detail than did the photos that were taken on the property, were admitted into evidence. Goad characterized the wound as a "chronic injury" that was "[d]efinitely slow" to develop. When asked "how long generally would it take for an injury like this to occur," Goad testified, "It would definitely be a minimum of two weeks. With this specific case with the depth of tissue involvement I would probably estimate maybe more like a month or potentially even longer than that, but it would have to be at least two weeks." She added that the lack of fresh blood on the wound indicated to her that it was "an old injury that's been going on for a while." Goad also testified that someone who was providing daily care and having daily interaction with the dog would be aware of this injury and that the injury would not have been hidden from view by the collar. Goad did not believe that the injury would have been caused by a harness, which would be placed on a dog's shoulders and sternum rather than around its neck, or by the dog getting caught underneath a fence, which she would expect to cause an injury to the backside of the dog's neck rather than the front. Instead, Goad suspected that the injury had been caused by a

5

collar that was "really snug" against the dog's neck, which occurs when a puppy is placed into a collar and the collar is not adjusted as the puppy grows larger.

Dr. Goad testified that the dog had required immediate veterinary care and that it should have received immediate care as soon as the wound was discovered. She explained,

> [T]he wound is not, I guess, like an acute trauma like an animal that's internal bleeding and it's like, oh, my gosh, it's an emergency, we have to do emergency surgery, but I think this particular dog's wounds—like it's kind of a situation where the quicker they're tended to, the less severe it gets and usually then the faster recovery for the patient, so it's not something we wait on. It's like, well, as soon as you can have it repaired, it's best because the longer you wait, the worse it gets kind of thing.

Because of the "depth" of the wound, Goad doubted that the injury would have healed on its own, although she acknowledged that "like in six months, it probably could have healed on its own as long as nothing was on the neck and it was on antibiotics and was, like, cleaned daily." Goad did not believe that the wound would have healed with Vetericyn, which she described as "essentially [] sterile water" that was "good to clean a wound with, but as far as actual wound treatment it doesn't do a whole lot or necessarily facilitate healing or relieve pain."

Mills's boyfriend, John Feist, owned the property where the dog was found and testified for the defense. Feist testified that Mills was a former animal-control officer and that she loved animals. He claimed that when Mills brought the dog to the property, two or three weeks before the police were called, the dog did not have a collar on it. Feist saw the dog "get up underneath the fence" on multiple occasions, and he believed that this caused the dog's injury. Feist further testified that Mills discovered the injury to the dog only "two or three days" before the police were called and that she had been treating it with "over-the-counter antibiotic spray and hydrogen peroxide and some other stuff," which he testified had been recommended

6

by a veterinarian whom Mills had called. Feist acknowledged that he and Mills had decided against taking the dog to a veterinarian because they "didn't have the money to take it to the vet."

At the conclusion of trial, the district court found Mills guilty of committing animal cruelty as specified in paragraph II of the indictment, which alleged that Mills "intentionally, knowingly, or recklessly tortured or in a cruel manner cause[d] serious bodily injury to an animal, namely, a brown and white, female Catahoula Leopard mix dog by failing to properly adjust the size of the collar that was around the said dog's neck and allowing said collar to become [e]mbedded into the neck of the said dog."[1] The district court explained its finding of guilt on the record:

> It's really obvious to me what the cause of this injury was and this is about as severe of an embedded collar case as I've ever seen and it's not plausible or possible that anyone could be—could allow their pet to end up in this scenario without at least recklessly allowing that to take place.

This appeal followed.

## DISCUSSION

**Expert testimony**

During Deputy Doran's testimony, the State asked her whether it would "take days" for the dog's injury to occur. Mills objected, arguing that Doran was not qualified to

---

[1] Paragraph I of the indictment alleged that Mills committed the offense by placing the collar on the dog. The district court found that the State failed to present "any evidence [] as to who put the collar . . . on the dog" and thus did not find Mills guilty of committing the offense in that manner.

answer that question. The district court overruled the objection, and the following testimony was elicited:

> Q. Did this injury take days to occur?
>
> A. No, ma'am, much longer.
>
> Q. Much longer. How long?
>
> A. I would say at least a couple of weeks.

In her first issue, Mills asserts that the district court abused its discretion in admitting this testimony because Doran was not sufficiently qualified as an expert witness in dog-collar injuries to testify as to the length of time it took for the injury to occur.

An appellate court reviews a trial court's ruling on the admission of evidence, including expert testimony, for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Murray v. State*, 597 S.W.3d 964, 970 (Tex. App.—Austin 2020, pet. ref'd). The trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer*, 569 S.W.3d at 669 (citing *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). The trial court's ruling will not be reversed if it was "within the zone of reasonable disagreement." *Wolfe v. State*, 509 S.W.3d 325, 335 (Tex. Crim. App. 2017); *Tillman*, 354 S.W.3d at 435.

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific,

technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. "Three requirements must be met before expert testimony can be admitted: '(1) The witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case.'" *Rhomer*, 569 S.W.3d at 669 (quoting *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006)). "These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance." *Id*.; *Jessop v. State*, 368 S.W.3d 653, 688 (Tex. App.—Austin 2012, no pet.). In this case, Mills challenges only the witness's qualifications as an expert.

"The specialized knowledge that qualifies a witness to offer an expert opinion may be derived from specialized education, practical experience, a study of technical works or a combination of these things." *Rhomer*, 569 S.W.3d at 669 (citing *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000)). The evaluation of an expert's qualifications entails a two-step inquiry: first, whether the witness possesses sufficient background in a particular field, and second, whether that background goes to the matter on which the witness is to give an opinion. *Jessop*, 368 S.W.3d at 689 (citing *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010); *Vela*, 209 S.W.3d at 131). "The proponent must establish that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject." *Davis*, 329 S.W.3d at 813. "The focus is on the fit between the subject matter at issue and the expert's familiarity with it." *Id*. "Because the spectrum of education, skill, and training is so wide, a trial court has great

9

discretion in determining whether a witness possesses appropriate qualifications as an expert on a specific topic in a particular case." *Id*.

Here, Doran testified that before she became a law-enforcement officer, she had worked as a veterinary technician for thirteen to fourteen years, that she had worked for four different veterinarians and had received training from each of them, that she had been present for both examinations and surgeries of animals, and that she had seen "approximately four" embedded-collar cases during her time working as a veterinary technician. Given this training and experience, we cannot conclude that it was outside the zone of reasonable disagreement for the district court to find that Doran possessed a sufficient background in animal injuries generally and embedded-collar cases specifically so as to be qualified to provide expert testimony on the approximate length of time that it took for the injury in this case to develop. *See Davis v. State*, 313 S.W.3d 317, 350 (Tex. Crim. App. 2010) (explaining that "expertise can be acquired in numerous ways, including by training or experience" and that although "[a]n expert must possess some additional knowledge or expertise beyond that possessed by the average person," "the gap need not necessarily be monumental"); *Rodgers v. State*, 205 S.W.3d 525, 528 (Tex. Crim. App. 2006) ("If the expert evidence is close to the jury's common understanding, the witness's qualifications are less important than when the evidence is well outside the jury's own experience.").

Additionally, even if the district court had abused its discretion in admitting Doran's testimony, we cannot conclude on this record that Mills was harmed by its admission. The erroneous admission of expert testimony is non-constitutional error and thus must be disregarded unless it affected appellant's substantial rights. *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001);

10

*Washington v. State*, 485 S.W.3d 633, 638 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *Sandoval v. State*, 409 S.W.3d 259, 293 (Tex. App.—Austin 2013, no pet.); *see also* Tex. R. App. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Coble*, 330 S.W.3d at 280. An appellant's substantial rights are not affected by the erroneous admission of evidence if the same or similar evidence is admitted elsewhere without objection. *See id*. at 282; *Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010); *Leday v. State*, 983 S.W.2d 713, 717–18 (Tex. Crim. App. 1998); *Washington*, 485 S.W.3d at 638–39.

In this case, Dr. Goad, the veterinarian who had treated the dog and who had experience with embedded-collar cases, testified without objection that the dog's neck wound was a "slow and a chronic injury" and that the injury would "definitely" take "a minimum of two weeks" and "maybe more like a month or potentially even longer than that" to develop. Additionally, Officer Crumpler, who had been an animal-control officer before becoming an investigator and who herself had seen multiple embedded-collar cases, testified without objection that the dog's wound was not the type of injury that occurs rapidly but instead takes a long time to occur. Finally, Mills's neighbor who had discovered the dog's injury testified without objection that the absence of blood around the injury indicated to him that "the wound had been there a long time." In light of this other evidence establishing that the injury developed over an extended time period, we cannot conclude that Mills's substantial rights were affected by any error in the admission of Deputy Doran's testimony regarding the approximate length of time that the injury occurred.

We overrule Mills's first issue.

**Sufficiency of the evidence**

In her second issue, Mills asserts that the evidence is insufficient to support her conviction. Specifically, she contends that there is insufficient evidence that she intentionally, knowingly, or recklessly injured the dog.

"Under the Due Process Clause, a criminal conviction must be based on legally sufficient evidence." *Harrell v. State*, 620 S.W.3d 910, 913 (Tex. Crim. App. 2021) (citing *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015)). "In assessing the sufficiency of the evidence to support a criminal conviction, 'we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt.'" *Braughton v. State*, 569 S.W.3d 592, 607–08 (Tex. Crim. App. 2018) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). "When reviewing whether there is legally sufficient evidence to support a criminal conviction, the standard of review we apply is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Murray*, 457 S.W.3d at 448 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "On appeal, reviewing courts 'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Murray*, 457 S.W.3d at 448 (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). "Thus, '[a]ppellate courts are not permitted to use a "divide and conquer" strategy for evaluating

12

sufficiency of the evidence' because that approach does not consider the cumulative force of all the evidence." *Id*. (quoting *Hacker v. State*, 389 S.W.3d 860, 873 (Tex. Crim. App. 2013)). "When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination." *Id*. at 448–49 (citing *Hooper*, 214 S.W.3d at 12).

A person commits the offense of cruelty to a non-livestock animal if she intentionally, knowingly, or recklessly tortures an animal or in a cruel manner kills or causes serious bodily injury to an animal. Tex. Penal Code § 42.092(b)(1). "Cruel manner" includes a manner that causes or permits unjustified or unwarranted pain or suffering, *id*. § 42.092(a)(3), and "torture" includes any act that causes unjustifiable pain or suffering to the animal, *id*. § 42.092(a)(8).

A person acts intentionally, or with intent, with respect to the nature of her conduct or to a result of her conduct when it is her conscious objective or desire to engage in the conduct or cause the result. *Id*. § 6.03(a). A person acts knowingly, or with knowledge, with respect to the nature of her conduct or to circumstances surrounding her conduct when she is aware of the nature of her conduct or that the circumstances exist, and she acts knowingly with respect to a result of her conduct when she is aware that her conduct is reasonably certain to cause the result. *Id*. § 6.03(b). A person acts recklessly, or is reckless, with respect to circumstances surrounding her conduct or the result of her conduct when she is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur, and the risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id*. § 6.03(c).

13

"By its nature, a culpable mental state must generally be inferred from the circumstances" of the offense. *Romano v. State*, 610 S.W.3d 30, 35 (Tex. Crim. App. 2020). The defendant's mental state may be inferred from circumstantial evidence such as acts, words, and the conduct of the defendant before, during, and after the offense. *Guevara v. State*, 152 S.W.3d 45, 49–50 (Tex. Crim. App. 2004). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Clayton*, 235 S.W.3d at 778. Additionally, when the record supports conflicting inferences regarding the defendant's mental state, as with any other element of the offense, "we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

The evidence summarized above shows that Mills admitted to the officers that the dog belonged to her, that she fed the dog at least once a day, that she was aware the dog had a collar on it, that she had known about the dog's injury for two to three weeks before her neighbor reported the injury to the police, and that she had been attempting to treat the injury with Vetericyn, which Dr. Goad described as "essentially [] sterile water" that was "good to clean a wound with, but as far as actual wound treatment it doesn't do a whole lot or necessarily facilitate healing or relieve pain." Goad testified that the dog should have received immediate care from a veterinarian weeks earlier than it did. She explained that the injury was preventable and that if it had been "caught early [it] would be [a] very minor injury more equivalent to, like, a superficial abrasion or even just a small amount of hair loss with, like, a rash."

Dr. Goad further testified that someone who was providing daily care and having daily interaction with the dog would be aware of this injury, which she opined would not have been hidden from view by the dog's collar. Deputy Doran provided similar testimony,

14

explaining that when she saw the dog, "there was obvious[ly] . . . some drainage going down the dog's neck already that was coming from the wound," "black and brown clots around it that indicated dried blood," and "flesh that was showing" around the dog's neck. Moreover, both Dr. Goad and Doran testified that the collar itself would have been visible to anyone interacting regularly with the dog, even after the collar had become deeply embedded in the dog's flesh. Mills's neighbor saw the collar on the dog when he discovered the injury, and he "knew that once [he] saw that, that's what the problem was," and he immediately sought to remove the collar from the dog, going so far as to use wire cutters to get it off the dog's neck. Also, Mills's boyfriend testified that Mills, who was a former animal-control officer, called a veterinarian immediately after she discovered the injury but decided not to take the dog to the veterinarian because "at the time [they] couldn't afford a big vet bill." Finally, the photographs admitted into evidence revealed in graphic detail the severity of the injury to the dog, and from those photos it could be reasonably inferred that Mills was aware of the seriousness of the injury and that the injury was caused by a tight collar but that Mills, unlike her neighbor, chose not to relieve the dog's pain and suffering by adjusting or removing the collar.

Viewing the combined and cumulative force of this evidence in the light most favorable to the verdict, we conclude that it supports a finding by the district court that at the very least, Mills was aware of but consciously disregarded the risk that her failure to properly adjust or remove the dog's collar would cause it serious bodily injury and unwarranted pain and suffering. Thus, the evidence was sufficient to prove that she possessed the culpable mental state required to commit the offense of animal cruelty as alleged. *See Martinez v. State*, 48 S.W.3d 273, 276 (Tex. App.—San Antonio 2001, pet. ref'd) (explaining that factfinder "may infer a culpable mental state from the circumstances surrounding the offense of cruelty to animals," including

15

"obvious and severe illness" and "a long-neglected need for treatment"); *Pine v. State*, 889 S.W.2d 625, 630 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd) (evidence sufficient to prove culpable mental state when multiple witnesses testified that animal's poor condition would be "readily obvious to any observer").

We overrule Mills's second issue.

## CONCLUSION

We affirm the district court's judgment of conviction.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed:   September 28, 2022

Do Not Publish