**Opinion issued December 31, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00884-CR

———————————

## NEIL MUKHERJEE, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 184th District Court**
**Harris County, Texas**
**Trial Court Case No. 1566723**

---

## MEMORANDUM OPINION

Neil Mukherjee appeals his conviction for capital murder. In fifteen issues, he challenges the sufficiency of the evidence, the admission of several pieces of evidence: his statement, evidence of an extraneous robbery, surveillance video and still photographs, the photo identification array, in-court identifications, the 911

recording, and victim impact testimony, and finally, the propriety of the prosecutor's closing argument. After a thorough review of the record and the applicable law, we affirm.

**Background**

In 2012, Houston Police Officer R. Alva responded to a call about a daytime shooting at an apartment complex in northwest Houston. Once at the apartment, Alva knocked but did not receive a response. The front door was unlocked. The door showed no signs of forced entry, but the screen on the window was bent. He found a woman face down in a pool of blood on the floor, still alive, but unable to answer questions. Her child, about a year old, was unharmed, sitting in a high chair. The woman, later identified as V. Rodriguez, died at the hospital from multiple gunshot wounds.

Lieutenant W. Meeler canvassed the apartment complex. He talked to residents who described a "suspicious individual" in a gray hoodie who had been "dodging employees" at the apartment complex that morning and was seen several times around Rodriguez's apartment. Meeler obtained surveillance video that matched the individual's description and depicted a man parking and exiting a vehicle, putting on a gray Air Jordan Jumbo Jumpman hoodie, covering his head with the hood, and entering the complex. Meeler released the video, stills from the video, and the clothing description to the media and the public.

In response, Meeler received an anonymous tip that included the name Neil Jay Mukherjee, a date of birth, identification of the vehicle in the video as a Chevy TrailBlazer, and information that Mukherjee dropped his mother at work across the street every morning. Meeler also received a call from the Harris County Sherriff's Office reporting that they were investigating a case with similar details. The Sherriff's case was an aggravated robbery in which two eye witnesses had picked Mukherjee out of a photo line-up as the person they saw in the area. Based on the anonymous tip, Meeler found a photograph of a Neil Jay Mukherjee and discovered that he had a job interview scheduled in Donna, Texas. Meeler arranged a multijurisdictional SWAT team from the Donna area and traveled there with two police sergeants to speak with Mukherjee. Upon arriving in Donna, Meeler received information that there was probable cause to arrest Mukherjee on the Sherriff's case.

As Mukherjee departed his job interview, the SWAT team arrested him for aggravated robbery. Following his arrest and statements to the police, Mukherjee was indicted for capital murder. A jury found him guilty of capital murder, resulting in an automatic sentence of life without parole.

**Legal Sufficiency**

In issues one and two, Mukherjee contends that there is insufficient evidence to sustain his conviction for capital murder and that the trial court erred in denying his motion for directed verdict. Specifically, Mukherjee argues that the State did not

3

establish beyond a reasonable doubt that Mukherjee killed Rodriguez during the course of a burglary or robbery. In issue fourteen, Mukherjee argues that the trial court erred in giving the capital murder charge to the jury because there was insufficient evidence.

## A.      Standard of review

We review the sufficiency of the evidence establishing the elements of a criminal offense for which the State has the burden of proof under *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). Under the *Jackson* standard, evidence is insufficient to support a conviction if, considering the record in the light most favorable to the verdict, no rational fact-finder could have found that the State proved each element of the charged offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *In re Winship*, 397 U.S. 358, 361 (1970); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). Evidence is insufficient under four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains merely a "modicum" of evidence, probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; or (4) the acts alleged do not constitute the criminal offense charged. *See Jackson*, 443 U.S. at 314, 318 & n.11, 320; *see also Laster*, 275 S.W.3d at 518.

The sufficiency-of-the-evidence standard gives due credit to the role of the factfinder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *see Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We presume that the fact-finder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution as long as the resolution is rational. *See Jackson*, 443 U.S. at 326.

In our review of the record, "[d]irect and circumstantial evidence are treated equally: 'circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be enough to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Finally, "[e]ach fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

**B.      Elements of the offense**

A person commits capital murder if he intentionally or knowingly causes the death of another in the course of committing or attempting to commit a specified offense, here, burglary of a building or attempted robbery. *See* TEX. PENAL CODE § 19.03(a)(1), (2).

A person commits burglary if, without the effective consent of the owner, the person (1) enters a building or any portion of a building, not then open to the public, with intent to commit a felony, theft, or assault or (2) enters a building and commits or attempts to commit a felony, theft, or an assault. TEX. PENAL CODE § 30.02(a)(1), (3).

## C.  Burglary and murder evidence at trial

In a prosecution for capital murder based on burglary, the murder of the victim satisfies the requirement that the entry be accompanied by the intent to commit a felony. *Gardner v. State*, 306 S.W.3d 284, 287 (Tex. Crim. App. 2009). Here, the jury heard evidence that Mukherjee entered Rodriguez's home and that she was shot multiple times and died as a result of her wounds. Even under Mukherjee's version of events, he entered Rodriguez's home after she had told him to leave. The apartment was not open.

As to Mukherjee's intent to kill, the jury was entitled to rely on his decision to cover his head before going to her apartment, his failure to assist or call for help following the shooting, his theft of her cell phone so she could not call for help herself, his flight from the scene after picking up a shell casing from the floor, and testimony that he committed another similar robbery the same day with the same weapon. The jury was also allowed to credit testimony that Rodriguez did not own a gun or ammunition. The jury was entitled to use all these facts to conclude that

Mukherjee intended to shoot Rodriguez and that it was not an accident. *Curry v. State*, No. PD-0577-18, 2019 WL 5587330, at *6 (Tex. Crim. App. Oct. 30, 2019) ("Juries can draw any reasonable inference from the facts so long as each inference is supported by the evidence."). The jury was free to disbelieve Mukherjee's explanation that he shot Rodriguez accidentally after mistakenly arriving at her apartment and struggling over a gun. *Id.* ("The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony."). When the record supports conflicting, reasonable inferences, we presume that the jury resolved the conflicts in favor of the verdict. *Jackson*, 443 U.S. at 326.

Because there was legally sufficient evidence that Mukherjee entered Rodriguez's home and intentionally shot her, there was sufficient evidence to sustain his conviction for capital murder. For the same reasons, the trial court did not err by denying Mukherjee's motion for directed verdict. Because there was sufficient evidence of burglary, we need not address whether there was sufficient evidence of attempted robbery as part of the intentional killing of Rodriguez. Because there was sufficient evidence of burglary and murder, the trial court did not err in submitting the capital murder charge to the jury. We overrule issues one, two, and fourteen.

**Custodial Statements**

In his third issue, Mukherjee asserts that the trial court erred by denying his motion to suppress his statements made in custody because law enforcement violated

his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), by using a "two-step process" of extracting incriminating statements before reading him his *Miranda* rights on the record. The State responds that the unrecorded portion of the interaction between Mukherjee and police began with *Miranda* warnings and consisted of "rapport building," and that in the ensuing credibility contest, the trial court was entitled to believe the detective's testimony over Mukherjee's.

## A.     Mukherjee's arrest and interview

Following a tip that Mukherjee was interviewing for a job in Donna, Texas, police officers, in concert with a SWAT team, arrested him for aggravated robbery. Officer E. Cisneros traveled to Donna to interview him. The interview occurred at a local Department of Public Safety office. Cisneros testified that he read Mukherjee his *Miranda* rights before the interview began. The first part of the interview, which Cisneros called "rapport building," was about 25 minutes and was not recorded. The second part of the interview, which Cisneros did record, began with *Miranda* warnings and a statement by Cisneros that he had administered the warnings previously. Both times, according to Cisneros, Mukherjee said that he understood these warnings and agreed to waive his rights and speak to him.

During the recorded part of the interview, Mukherjee stated that on the date of the offense, he was wearing a gray Air Jordan hoodie and shorts, driving a green Chevy TrailBlazer, and went to the apartment complex where the offense occurred

to look for his friend who had moved. He knocked on an apartment door and asked for his friend Maricela. A woman opened the door, told him to leave, and pulled a gun on him. Mukherjee reached out, pushed the gun away, grabbed the gun from her, and forced the woman backward to the interior hallway of her apartment. Mukherjee did not want the woman to call the police so he grabbed her cell phone from her with his other hand. According to Mukherjee, the woman came at him and swung at his face, scratching him, causing him to squeeze the trigger of the gun multiple times, shooting the woman. Mukherjee checked the other rooms of the apartment to see if anyone else was there. Mukherjee picked up a shell casing in the hallway, stepped over the bleeding woman lying on the floor, and left with the gun and the woman's phone. He ran to his car and drove off, throwing the gun and the phone out of the window before he got on the freeway to Greenspoint.

## B. Standard of review

When reviewing a trial court's decision on a motion to suppress statements from a custodial interrogation, we conduct a bifurcated review. *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012). We afford almost total deference to the trial court's rulings on questions of historical fact and credibility and review de novo the trial court's rulings on questions of law and on application of law to questions of fact that do not turn upon credibility or demeanor. *Id.* The court views the evidence presented on a motion to suppress in the light most favorable to the trial court's

9

ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We will affirm the trial court's ruling if it is correct under any theory of law applicable to the case and is reasonably supported by the record. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007).

## C.    Credibility determination

Under the Fifth Amendment, no one may be compelled to be a witness against himself in a criminal case. U.S. CONST. amend. V. Police must administer suspects warnings of their constitutional rights before custodial interrogation. *Miranda*, 384 U.S. at 479. The United States Supreme Court has held that it is impermissible for police to first ask questions of suspects in custody and only later warn suspects of their *Miranda* rights. *Missouri v. Seibert*, 542 U.S. 600, 617 (2004). *Seibert* applies only to deliberate police misconduct intending to subvert the protections of *Miranda*. *See Carter v. State*, 309 S.W.3d 31, 38 (Tex. Crim. App. 2010).

Here, there is no debate that Mukherjee was "in custody" under the Fifth Amendment when Cisneros interrogated him. Mukherjee had been arrested by a SWAT team and brought to a DPS office in restraints. The only open questions are whether Cisneros administered *Miranda* warnings before questioning Mukherjee, and, if he failed to do so, whether that failure was deliberate.

The record reflects two competing versions of what happened during Cisneros's interrogation of Mukherjee. Cisneros testified that he administered

10

*Miranda* warnings twice, once at the beginning of the unrecorded "rapport building"[1] portion of the interview and again at the beginning of the recorded portion of the interview that the jury heard. According to Cisneros, both times, Mukherjee waived those rights and agreed to answer questions. The recording begins with Cisneros suggesting that Mukherjee pull his chair up and advising that Cisneros would read him the Texas Statutory Warnings that were on a "little blue card that [Cisneros] read to him earlier." Mukherjee did not contradict Cisneros on the recording or say that he had never seen the card or heard the warnings before.

Mukherjee testified that he received no warnings the first time, during the unrecorded portion of the interview. But Cisneros disagreed. The trial court, as the finder of fact, could find Cisneros credible and resolve the disputed issue against Mukherjee. *See Enriquez v. State*, 501 S.W.2d 117, 120 (Tex. Crim. App. 1973). In denying the motion to suppress, the trial court impliedly rejected Mukherjee's version of the facts. *Walter v. State*, 28 S.W.3d 538, 540 (Tex. Crim. App. 2000).

---

[1] Cisneros and Mukherjee diverge as to the topics covered in the unrecorded portion of the interview. According to Cisneros, the unrecorded portion of the interview included some discussion of where Mukherjee was from, whether he had role models, whether he had any prior arrests, and about the tattoo on his face. to Mukherjee, the unrecorded portion of the interview also included discussion of Rodriguez's murder and his confession to killing Rodriguez accidentally, which Cisneros suggested after telling him that twelve U.S. Marshals were waiting next door and that he would be convicted of murder and never see his children again. *See State v. Cruz*, 461 S.W.3d 531, 536 (Tex. Crim. App. 2015) ("In the *Miranda* context, 'interrogation' means 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response.'").

11

The record supports the implied finding that Mukherjee's statement was voluntary and was not obtained using a prohibited two-step "ask first, warn later" method. The trial court did not err in denying Mukherjee's motion to suppress his custodial statements. We overrule Mukherjee's third issue.

## Extraneous Offense Evidence

In issues four, five, and six, Mukherjee relies on Texas Rules of Evidence 404(b) and 403 to challenge the admission of evidence of an aggravated robbery the same day as Rodriguez's murder. The State responds that the extraneous aggravated robbery evidence was relevant to prove the absence of mistake or accident.

### A. Aggravated robbery evidence

Harris County Sherriff's Deputy C. Friedrich was investigating a home invasion at an apartment complex across town from where Rodriguez was murdered. The doorjamb to the apartment where the robbery occurred was broken, suggesting a forced entry. Friedrich found blood on the floor, a bullet hole in one of the cabinets, and a shell casing.

The woman who was robbed, T. Cruz, had a two-inch laceration on her head. She told police that when she was entering her apartment carrying her small child, a young man hit her in the head with a gun from behind. The gun discharged but she was not shot. He pushed her into a chair, threatened her with the gun, and demanded

money. She said she had no money, but offered him her wallet. He did not take it. The man was in her apartment for two minutes then left.

Cruz gave a description of the assailant as a short, young man with black hair and a tattoo under his left eye. The apartment manager had also seen the suspect. Friedrich was in search of a Hispanic male, described as short, with short hair, wearing a gray hoodie, dark pants, and a box tattoo under his eye. Friedrich saw the coverage of the Rodriguez murder case in the media and thought the suspect in that case matched the description of the man he was searching for. He asked the apartment manager to view the video, then he spoke to Meeler and got Mukherjee's name. Friedrich then showed Cruz and the apartment manager a photo array containing Mukherjee's photo along with photos of five other men. Both identified Mukherjee. Friedrich filed for a warrant for Mukherjee's arrest for aggravated robbery. A judge signed the warrant, and Mukherjee was charged with aggravated robbery. It was later determined that a cartridge casing retrieved from Cruz's apartment came from the same gun as a cartridge casing retrieved from Rodriguez's apartment.

## B.    Standard of Review

Appellate courts review a trial court's determination of the admissibility of extraneous-offense evidence under an abuse-of-discretion standard. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). This court will uphold a trial court's

decision to admit extraneous-offense evidence if it is "within the zone of reasonable disagreement." *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). A trial court's ruling on extraneous-offense evidence is generally within the zone of reasonable disagreement "if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). Furthermore, we uphold an evidentiary ruling under any applicable theory of law, "even if the trial judge gave the wrong reason for [the] right ruling." *Id.*

## C.    Rule 404(b)

Generally, evidence of a person's character is inadmissible to prove that on a particular occasion the person acted in conformity with the character or trait. TEX. R. EVID. 404(a)(1). Although evidence of a crime, wrong, or other act is not admissible to prove a person's character to show propensity, extraneous offense evidence may be admissible for other purposes, such as proving the "absence of mistake" or "lack of accident." TEX. R. EVID. 404(b). The admissibility of an extraneous offense under Rule 404(b) hinges on whether (1) it is relevant to an issue other than the defendant's character and (2) it has probative value that is not

substantially outweighed by undue prejudice under Rule 403. *See Montgomery v. State*, 810 S.W.2d 372, 376–77 (Tex. Crim. App. 1990).

"When the defendant's intent to commit the offense charged is at issue, the relevance of an extraneous offense derives from the doctrine of chances–the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all." *Brown v. State*, 96 S.W.3d 508, 512 (Tex. App.—Austin 2002, no pet.); *see Wilson v. State*, 473 S.W.3d 889, 905 (Tex. App.— Houston [1st Dist.] 2015, pet. ref'd). The State had the burden to prove that Mukherjee intentionally killed Rodriguez. Because Mukherjee admitted that he had shot Rodriguez, his intent was all that was at issue. The extraneous aggravated robbery offense, committed the same day, with the same weapon, under similar circumstances, tends to show that Mukherjee did not shoot Rodriguez accidentally. *See Johnston v. State*, 145 S.W.3d 215, 222 (Tex. Crim. App. 2004); *Smith v. State*, 898 S.W.2d 838, 842 (Tex. Crim. App. 1995) (en banc). Thus, the extraneous offense is relevant to an issue other than Mukherjee's character or propensity.

## D.    Rule 403

The next part of the 404(b) analysis mirrors the balancing, under Rule 403, of the value of the probative evidence against the danger of unfair prejudice to the defendant. *Montgomery*, 810 S.W.2d at 377. "Evidence is prejudicial only when it

tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *Id.* at 378 (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). The court considers these factors:

(1) the strength of the evidence in making a fact more or less probable;

(2) the potential of the extraneous offense evidence to impress the jury in some irrational but indelible way;

(3) the time the proponent needed to develop the evidence; and

(4) the strength of the proponent's need for the evidence to prove a fact of consequence.

*Powell v. State*, 189 S.W.3d 285, 287 (Tex. Crim. App. 2006). Because there was no video of or eyewitness to the interaction between Mukherjee and Rodriguez, there was little other evidence of Mukerjee's intent, which weighs in the State's favor for factors one and four. Although Mukherjee argues that the State "did not need the robbery case to make sense of what happened in the capital murder case," that is not so. Mukherjee claimed Rodriguez's death was accidental. In opening argument, defense counsel argued that the close-range injuries Rodriguez received fit with "trying to get a gun away from somebody" and "with a struggle," and so "this was not an intentional killing per se. It was a struggle over a gun. The thing went off."

Evidence of a similar offense, the same day, against a second woman with a child at her apartment, with the same firearm, would have helped clarify whether Mukherjee shot Rodriguez intentionally. Although any violent extraneous offense

16

could stoke the passions of the jury, that alone cannot weigh against admission of all violent extraneous offenses. *Cf. Martin v. State*, 173 S.W.3d 463, 468 (Tex. Crim. App. 2005) (upholding admission of extraneous sexual assault evidence in similar sexual assault case because consent was at issue).

In any event, we presume the jury followed the court's instruction, both at the beginning of the case and after the close of evidence, to use the extraneous offense evidence only to determine "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" of the defendant and for no other purpose. *See McGregor v. State*, 394 S.W.3d 90, 121 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (quoting TEX. R. EVID. 404(b)). The final factor is the time needed to develop the evidence, which Mukherjee does not challenge. The State called two eyewitnesses and the investigating officer to testify about the extraneous aggravated robbery. There were 15 witnesses for the entire trial. Rule 403 "envisions exclusion of evidence only when there is a 'clear disparity between the degree of prejudice of the offered evidence and its probative value.'" *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (quoting *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)). There is no clear disparity here.

We conclude that the trial court did not err in determining that the extraneous robbery was relevant to an issue other than character conformity, namely intent and the lack of accident, and that the probative value of this evidence was not

17

substantially outweighed by undue prejudice to Mukherjee. We overrule issues four, five, and six.

## Admission of Video Evidence

Mukherjee contends in his seventh issue that the trial court erred by admitting a copy of surveillance video and still images taken from video of Rodriguez's apartment building because there was inadequate foundation from the sponsoring witness. In response, the State argues that the proponent of a video may show its authenticity without testimony from someone who witnessed what the video depicts.

While investigating the case, officers asked A. Martinez, the owner of the business that installed the security system at Rodriguez's apartment complex, to retrieve the video from the DVR recorded the day Rodriguez was killed. His employee retrieved the data and put it on a USB drive belonging to the police. Martinez reviewed the video to verify that it was transferred correctly.

At trial, Martinez testified that the video feed from camera six that his firm put on the USB matched the DVD offered at trial, depicting a man wearing a hoodie walking through the entrance to Rodriguez's apartment complex the day she was killed. He also noted the watermark on the video that identified it as being from the apartment complex video equipment. The watermark represents an encryption that prevents anyone without the proper software from viewing the video. According to Martinez, the watermark shows that the video was not edited. Martinez identified

18

the six stills as having been taken from the DVD containing the content from the DVR recording of the apartment complex security footage and confirmed that they fairly and accurately represented the scene recorded in the video. Over defense counsel's objection, the court admitted the video and the still images taken from the video.

## A.    Standard of review

We review a trial court's ruling on the admissibility of evidence over an authentication objection using the abuse of discretion standard. *Angleton v. State*, 971 S.W.2d 65, 67 (Tex. Crim. App. 1998) (en banc). If the trial court's ruling is "within the zone of reasonable disagreement, the appellate court will not interfere." *Washington v. State*, 485 S.W.3d 633, 640 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

## B.    Authentication

Authentication is a condition precedent to the admissibility of evidence. TEX. R. EVID. 901(a). It is met by evidence sufficient to support a finding that the matter in question is what its proponent claims. *Id*. In a jury trial, the preliminary question for the trial court is whether the proponent of the proffered evidence has supplied sufficient facts to support a reasonable jury determination that the evidence is authentic. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). Although the typical way to provide facts that support a reasonable jury determination that the

evidence is what it purports to be is through a witness with personal knowledge, it is not the only way. *Fowler*, 544 S.W.3d at 848. Instead, evidence may also be authenticated by "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." *Id.* at 849 (citing TEX. R. EVID. 901(b)(4)).

Here, the State's witness, Martinez, testified that he installed the security camera, reviewed the video footage on the day it was captured in 2012, and supervised the transfer of the video. He identified the digital watermark and confirmed that the footage had not been edited and that the stills from the video were a fair and accurate depiction of the scene at the apartment complex.

In light of Martinez's testimony, we cannot say that the trial court's decision to admit the surveillance video and stills was an abuse of discretion. We overrule issue seven.

### Admission of Photo Arrays and In-Court Identifications

In issues eight and nine, Mukherjee argues that the photo arrays showed to Cruz and the apartment manager were unduly suggestive and that they tainted the in-court and out-of-court identifications. Specifically, Mukherjee objects to the array because, although Mukherjee's was not the only photo in the array with a tattoo under his eye, his was the only one with a distinctive "box" tattoo. Mukherjee contends that the trial court committed reversible error in admitting the suggestive

photo arrays and permitting witnesses who had participated in the photo-array identification to identify him in court.

## A.    Photo array

The apartment manager reviewed the surveillance video from Rodriguez's apartment complex and said it "sent chills down her spine." Based on the apartment manager recognizing the person in the video, Detective Friedrich prepared photo arrays to show her and Cruz, the complaining witness in the aggravated robbery. The police database selected the fill-in photos at random based on the identifying criteria Friedrich inputted. Mukherjee's photo was the only one in the array with a square tattoo under the eye. The database did not have a selection for square tattoos under the eye, but Friedrich could have digitally added a tattoo to each photo. He did not know this at the time. The two arrays displayed photos of the same six men in different order. Friedrich showed the photo arrays to Cruz and the apartment manager on the same day in separate locations.[2] Both selected the photo of Mukherjee as the person who was in and around Cruz's apartment. After each witness had positively identified Mukherjee, Friedrich told each witness that she had selected the right person and that the person she identified had committed a homicide just before he broke into Cruz's apartment.

---

[2]    There was conflicting testimony about whether Friedrich was in the room while the witnesses reviewed the photo arrays. Friedrich said he left the room, but Cruz testified that he was present when she made her identification.

Friedrich admitted that having no photos of men with square tattoos under their eyes could be suggestive and that telling witnesses that they accurately identified the suspect could bolster the out-of-court and later in-court identifications. Defense counsel objected to the admission of the photo arrays and to in-court identification of Mukherjee. The court overruled the objections, admitted the photo arrays, and allowed Cruz and the apartment manager to identify Mukherjee in court.

**B.     Standard of review**

The standard of review on a claim that an in-court identification should not have been admitted because of the taint of an impermissibly suggestive pretrial identification procedure is set forth in *Loserth v. State,* 963 S.W.2d 770 (Tex. Crim. App. 1998) (en banc). Our standard of review turns on the type of question presented to the reviewing court. *Id.* at 772. First, in general, we must give almost total deference to a trial court's determination of historical facts supported by the record, especially when the trial court's fact findings are based on the credibility and demeanor of the witnesses. *Id.* Second, we give the same amount of deference to the trial court's rulings on "application of law to fact questions," also known as "mixed questions of law and fact," if resolving those questions turns on an evaluation of credibility and demeanor. *Id.* Finally, we review de novo "mixed questions of law and fact" that do not fall within the second category. *Id.* Here, whether an identification procedure was so impermissibly suggestive as to give rise to a very

22

substantial likelihood of misidentification is a mixed question of law and fact that does not turn on an evaluation of credibility and demeanor. *Id.* at 772–73. Thus, we apply a de novo standard of review.

## C.     Admissibility challenge

When challenging the admissibility of a pretrial identification, the defendant has the burden to show that (1) the out-of-court identification procedure was impermissibly suggestive, and (2) the suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995) (citing *Simmons v. United States*, 390 U.S. 377 (1968)). The court examines the "totality of the circumstances" surrounding the case and determines the reliability of the identification. *Id*.

Cruz gave police a detailed description of her assailant right after the incident. Cruz testified that she could recognize Mukherjee's photo quickly in the array because she "got a good look at his face" when he was in her apartment for two minutes. She recognized the color of his shirt. There was no testimony that Mukherjee's face was obstructed by a mask, hat, or other covering or that she had any impairment in her vision or memory. Most importantly, Cruz testified that she selected Mukherjee because of his face, not his tattoo.

The apartment manager remembered that the person she saw when she was walking her property wore a gray long-sleeved hoodie and had a tattoo near his eye.

23

She knew all her residents so the man stood out. When she talked to Cruz about the robbery, Cruz mentioned the man with the tattoo, leading the apartment manager to believe she had seen the same man. The day of the incident, she gave a description to police, that the man was about 5'3" to 5'5" and 160 pounds, with black hair, brown eyes, and a square tattoo under his right eye, wearing a gray hoodie. The apartment manager recognized the tattoo when she identified Mukherjee in the photo array, but she also recognized his face and "the way he looks." As soon as the deputy showed her the photos, the apartment manager knew who it was because, as they crossed paths, she and the man were just inches apart and looked each other in the eye. She also recognized the man's clothing from the surveillance video from the other apartment complex.

Even if the photo array were impermissibly suggestive, Mukherjee has no right to relief unless he can show that the lineup gave rise to a "very substantial likelihood of irreparable misidentification." *Balderas v. State*, 517 S.W.3d 756, 792 (Tex. Crim. App. 2016). "The court assesses reliability by weighing five non-exclusive factors against the corrupting effect of any suggestive identification procedure: (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the

confrontation." *Id*.; *see also Fisher v. State*, 525 S.W.3d 759, 763 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

Both witnesses had the opportunity to view the suspect the morning of the robbery at close range with close attention. During daylight hours, the apartment manager locked eyes with him a few inches from her and noted him as not being one of her residents. Cruz observed him for two minutes in her apartment and spoke with him. Both witnesses described him as being a short-haired Hispanic male wearing a gray hoodie, not tall, with short hair and a tattoo under his eye. Both witnesses recognized the suspect, whose face could not be seen, in the video from the other apartment complex, based on other characteristics. The apartment manager's recognition was such that a chill ran up her spine when she reviewed the video. Both witnesses immediately recognized the man they saw in the photo lineup. Both witnesses were consistent in their identification of Mukherjee at confrontation. The time between the offense and the identification was a matter of days. In short, none of the *Balderas* factors support a finding that any impermissibly suggestive lineup created a substantial risk of misidentification that would deny Mukherjee due process. We overrule issues eight and nine.

### Admission of the 911 Recording

In issues ten, eleven, and twelve, Mukherjee contends that the recording of the 911 call from Rodriguez contained hearsay, denied Mukherjee his Sixth

Amendment right to confront his accusers, and should have been excluded because its probative value was substantially outweighed by its prejudicial impact. The State contends that Mukherjee failed to preserve his complaint for appeal because he did not identify which portions of the tape were inadmissible, the tape was not hearsay because it was not offered to prove the truth of the matter asserted, the tape contains present-sense impressions, the statements on the tape were non-testimonial so are not subject to confrontation, and the fact that a baby can be heard crying in the background does not make the tape substantially more prejudicial than probative. The State contends that the tape is admissible even though it does not establish a material fact because it provides a framework within which the State's evidence may be developed.

Before the introduction of the 911 call, defense counsel objected that it was hearsay, that it denied Mukherjee his Sixth Amendment right to confront witnesses, and that the prejudicial impact outweighed the probative value, then conceded that it was Rodriguez's voice on the tape. The State responded that Mukherjee had no right to confront the witness he killed, that it was filed as a business records affidavit, and it was "a basic 911 tape." The trial court overruled defense counsel's objections.

The jury heard the recording of the 911 call where someone identified as "Steve from Houston Fire" assists Rodriguez to complete a call and informs the operator that Rodriguez had tried to call before and that she had been shot.

26

Rodriguez, herself, does not really speak but can be heard moaning and breathing heavily for several minutes. A baby vocalizing can be heard in the background. Much of the recording is taken up with the operator being on hold while another call to an unknown entity is placed or waiting for services to arrive.

## 1.    Preservation

The State contends that Mukherjee failed to preserve his complaints about the admission of the 911 recording because he failed to specify which statements violated his right to confrontation, were hearsay and were more prejudicial than probative. To preserve error for appellate review, a defendant must make a complaint to the trial court "by a timely request, objection, or motion that . . .  state[s] the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). The context of the objections here makes the nature of the objections clear enough. *See Jimenez v. State*, 446 S.W.3d 544, 549–50 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("no 'magic words' are necessary" to preserve error). The defense sought to keep the entire recording out because it contained the statements of a witness

(Rodriguez) that he could not confront,[3] the entire recording was hearsay,[4] and was, in the defense's view, substantially more prejudicial than probative.[5] We hold that Mukherjee has preserved his issues for review.

## 2. Standard of review

In deciding the constitutional issue of whether the admission of a statement of another violates a defendant's Sixth Amendment confrontation right, appellate courts review the trial court's ruling de novo. *Mims v. State*, 238 S.W.3d 867, 871 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). An appellate court will not reverse a trial court's ruling unless that ruling falls outside the zone of reasonable disagreement. *Id.*

## 3. Confrontation under the Sixth Amendment

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

---

[3] When the trial court asked whose voice was on the call, defense counsel explained that it was the complainant's. If Rodriguez's portion of the recording were removed, the recording would lose any probative value.

[4] Defense counsel consistently referred to the recording collectively as "the tape."

[5] Defense counsel explained, "the tape is very, very – even for me, very emotional. And I know the emotional impact it would have on the jury will confuse the issues and make them reach a decision on emotions rather than on the law and logic."

28

against him." U.S. CONST. amend VI. This bedrock procedural guarantee applies to both federal and state prosecutions. *Pointer v. Texas*, 380 U.S. 400, 406 (1965). In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court established a new framework for analyzing Confrontation Clause claims. If the statement at issue is "testimonial," it is inadmissible unless the declarant is unavailable and the accused has had a prior opportunity for cross-examination. *Id.* at 53–54. Thus, the threshold issue under *Crawford* is whether the statement to be admitted is testimonial. *Spencer v. State*, 162 S.W.3d 877, 879 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). The *Crawford* Court did not define "testimonial," but it noted three formulations of "core" testimonial evidence: (1) "*ex parte* in-court testimony or its functional equivalent," such as affidavits, custodial examinations, prior testimony not subject to cross-examination, or "similar pretrial statements that declarants would reasonably expect to be used prosecutorially," (2) "extrajudicial statements" of the same nature "contained in formalized testimonial materials," and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 541 U.S. at 51–52.

To determine whether the admission of the 911 recording violated the Confrontation Clause, we must first determine whether the statements on the tape

are testimonial. In *Davis v. Washington*, the United States Supreme Court explained the distinction between testimonial and nontestimonial statements:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. 813, 822 (2006).

"Statements made to police during contact initiated by a witness at the beginning of an investigation are generally not considered testimonial." *Cook v. State*, 199 S.W.3d 495, 498 (Tex. App.—Houston [1st Dist.] 2006, no pet.). For this reason, 911 calls initiated to summon police assistance are generally nontestimonial because they are "a cry for help" or "the provision of information enabling officers to end a threatening situation." *Cook*, 199 S.W.3d at 498; *see Rodgers v. State*, No. 09-09-00359-CR, 2010 WL 3043705, at *2 (Tex. App.—Beaumont Aug. 4, 2010, no pet.) (mem. op., not designated for publication) (listing cases in which courts concluded similar 911 calls were nontestimonial).

In analyzing whether statements made to a 911 operator were testimonial, the *Davis* court noted four features of the call: (1) the caller was describing events as they were happening rather than past events; (2) any reasonable listener would recognize that the caller was facing an ongoing emergency; (3) when viewed

30

objectively, what was asked and answered was such that the elicited statements were necessary to resolve the present emergency; and (4) the caller was frantically answering the 911 emergency operator's questions over the phone, in an unsafe environment. *Davis*, 547 U.S. at 826–27.

Here, the entire purpose of the 911 call was to secure medical attention for Rodriguez during an ongoing medical emergency. There were no questions on the recording designed to advance a criminal prosecution. We conclude that the out-of-court statements on the 911 recording, when viewed objectively, were made under circumstances revealing that the primary purpose of the discussion was to enable the police to meet an ongoing emergency, rather than to establish or prove past events potentially relevant to later criminal prosecution. *See Davis*, 547 U.S. at 822. Because the statements were not testimonial, the trial court did not err in overruling Mukherjee's confrontation objection.

### 4.    Evidentiary objections

Besides the confrontation objection, Mukherjee lodged two objections to admission of the 911 call recording under the rules of evidence. First, Mukherjee objected that the 911 recording contained hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. TEX. R. EVID. 801(d); *Baldree v. State*, 248 S.W.3d 224, 230–31 (Tex. App.—Houston [1st Dist.] 2007,

31

pet. ref'd). Hearsay statements are inadmissible, except as provided by statute or other rule. TEX. R. EVID. 802; *Baldree*, 248 S.W.3d at 231.

"A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" is considered an "excited utterance" and is an exception to the rule against hearsay. TEX. R. EVID. 803(2). The statements, made shortly after Rodriguez was shot multiple times, were admissible as an excited utterance. *See Cook*, 199 S.W.3d at 498. We cannot say that the trial court acted outside the zone of reasonable disagreement in overruling Mukherjee's hearsay objection.

Next, Mukherjee challenges the admission of the 911 recording as substantially more prejudicial than probative. *See* TEX. R. EVID. 403. In reviewing a ruling on a 403 objection, first, we examine whether the evidence is relevant then we determine whether the "probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *De La Paz*, 279 S.W.3d at 344.

Although 911 recordings may be admissible even if unnecessary to establish a material fact because they "provide a framework" within which the State can develop its evidence, *see, e.g.*, *Webb v. State*, 760 S.W.2d 263, 276 (Tex. Crim. App. 1988) (en banc), that is not what happened here. Instead, the 911 recording was the last piece of evidence the jury heard. There was no further evidence to develop and,

32

indeed, no new information was adduced by admitting the recording. The State did not identify any probative evidence in the recording and we find none. The recording, however, was prejudicial. Although she is not speaking understandable words, Rodriguez moans and is breathing heavily. Her child can be heard crying in the background. The jury had already been told that she was found in a pool of blood and died. The recording had the potential to impress the jury in an irrational way.

Even if the 911 recording was erroneously admitted, to show reversible error, Mukherjee must demonstrate harm. Error in the admission of evidence is non-constitutional error subject to a harm analysis under Texas Rule of Appellate Procedure 44.2(b). *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); TEX. R. APP. P. 44.2(b). We disregard any non-constitutional error that does not affect substantial rights. TEX. R. APP. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We will not overturn a conviction for non-constitutional error if, after examining the record, we have fair assurance that the error did not influence the jury or had but a slight effect. *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001).

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how

we might consider it with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the voir dire, the State's theory and any defensive theories, jury instructions, closing arguments, and whether the State emphasized the error. *Id.* at 355–56.

The evidence against Mukherjee was very strong, which reduces the potential for any error to sway the jury. Two witnesses identified him, he admitted going into Rodriguez's apartment at the time of the offense and that the gun went off, causing Rodriguez's wounds, and there was video of someone matching his description at the apartment complex. The only issue for the jury to resolve was whether Rodriguez came to the door pointing a gun at Mukherjee and in an ensuing struggle the gun went off multiple times accidentally, or whether Mukherjee intentionally killed Rodriguez. The 911 call recording was a very brief portion of the trial. No questions were asked. It did not come up other than during the State's closing argument, and then only briefly:

> So, she reaches up and somehow pulls herself up to get this phone so that she can call to try to get somebody to help her. And you heard on the 911 phone call that once she – once she struggled and got that phone, she didn't have much left. She could barely talk at all. She was just breathing, trying to survive, trying to make it for her daughter, who was sitting in a highchair just feet away, crying for her mom, who's bleeding out on the floor in front of her. But she's breathing, trying to survive for her son, who she'd taken to school earlier that day, and for her husband who's at work. And, so, she survives until an ambulance gets there, until Officer Alva gets there, but not much longer.

Based on the strength of the evidence against Mukherjee and the limited time and emphasis on the recording, which contained only cumulative evidence, we cannot conclude that "the error itself has substantial influence" or that we are "left in grave doubt" that it does. *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946); *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001). Given the entire record, we cannot conclude that any error in admitting the 911 recording affected Mukherjee's substantial rights.

For these reasons, we overrule Mukherjee's issues ten, eleven, and twelve.

## Testimony of Rodriguez's Sister

In issue thirteen, Mukherjee argues that the trial court erred in admitting the testimony of Rodriguez's sister, which he classifies as irrelevant under Texas Rule of Evidence 401 and "victim-impact testimony." The State contends that Mukherjee failed to preserve error because he failed to obtain a ruling from the trial court when he objected to Rodriguez's sister's testimony and that the testimony at issue is not victim-impact testimony.

## A. Standard of review

The trial court exercises discretion in admitting victim impact evidence, while appropriately limiting the amount and scope of this evidence. *Salazar v. State*, 90

35

S.W.3d 330, 336 (Tex. Crim. App. 2002). An appellate court reviews the admission of victim impact testimony under an abuse of discretion standard. *Id.*

**B. Admission of details about Rodriguez's morning**

Victim-impact evidence is evidence of the "effect the victim's death" has on other people, particularly family members. *Haley v. State*, 173 S.W.3d 510, 517 (Tex. Crim. App. 2005). Victim-impact evidence may be admissible at punishment, when the defendant's personal responsibility or moral culpability is at issue. *Love v. State*, 199 S.W.3d 447, 456–57 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). But it is not relevant at the guilt-innocence phase of the trial because it does not tend to make more or less probable the existence of any fact of consequence about guilt. *Id.*; *see* TEX. R. EVID. 401.

Outside the presence of the jury, defense counsel first objected to Rodriguez's sister identifying Rodriguez with an autopsy photo on relevancy grounds. The prosecutor responded that the State had the burden of proof to show that it was Rodriguez who was killed and no one else had identified her. Defense counsel withdrew the objection. Defense counsel then objected to victim impact information such as where Rodriguez worked and that she was a loving mother. The trial court asked the prosecutor, "You're not going to try to do all that, are you?" The prosecutor replied, "Of course not."

The prosecutor did not elicit information about Rodriguez being a loving mother or where she worked, but she did ask why it would seem weird that Rodriguez would ask her sister to come over for breakfast. Defense counsel objected on relevance grounds and there was a bench conference. The prosecutor said it was "nothing really" and just that she wanted to know why it was weird. The defense reurged its relevance objection, but the trial court responded only "[a]ll right" and "[y]ou may proceed." The prosecutor asked detailed questions about what they had for breakfast and where Rodriguez was standing and where the baby was, without objection. When the State showed Rodriguez's sister the photo of Rodriguez and asked her to identify who was in the photo, the defense did not object.

## 1. Victim-impact

First, to preserve a complaint about the erroneous admission of victim-impact evidence, the defendant must object on the ground that evidence constitutes impermissible victim-impact evidence. *Reynolds v. State*, 371 S.W.3d 511, 525 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). After the initial objection, the defendant did not renew a victim-impact objection. *See Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial."); *Love*, 199 S.W.3d at 456 ("Texas law requires a party to continue to object each time inadmissible evidence is offered, except when defense counsel

37

requests a running objection or objects out of the presence of the jury to all testimony he deems objectionable on a given subject."). After the defense objection to potential victim-impact topics before Rodriguez's sister testified, the defense did not renew its victim-impact objection or obtain a running objection to any of the sister's testimony. As a result, Mukherjee did not preserve the victim-impact objection. *See Ashire v. State*, 296 S.W.3d 331, 342-43 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

Second, even if the error were preserved, the State solicited no testimony about the physical, psychological, or economic effects of the crime on Rodriguez's family members. *See Reynolds*, 371 S.W.3d at 526; *Love*, 199 S.W.3d at 456. Rodriguez's sister's testimony about the details of their last breakfast together is not victim-impact testimony because there was no discussion of how the offense affected Rodriguez's family after her death. *See Reynolds*, 371 S.W.3d at 526; *Love*, 199 S.W.3d at 456. Thus, Mukherjee's challenge to the trial court's decision to admit Rodriguez's sister's testimony as victim-impact evidence is unavailing.

### 2. Rule 401

There is also a preservation problem with the relevance objection. The defense objected once under Rule 401 to the State's question about why it was weird for Rodriguez to invite her sister to breakfast but did not renew the objection or obtain a running objection to over a dozen pages of testimony about Rodriguez's last few

38

hours that Mukherjee challenges on appeal. This could not preserve Mukherjee's broader appellate complaint about the relevance of all this testimony. *See Love*, 199 S.W.3d at 456.

While the sister's perception of why it was strange for her sister to invite her to breakfast has no apparent bearing on whether Mukherjee intentionally killed Rodriguez, *see* TEX. R. EVID. 401, Mukherjee identifies no harm from this inquiry and we find none. *See* TEX. R. APP. P. 44.2(b) (non-constitutional error that "does not affect substantial rights must be disregarded."). Reviewing only the preserved challenge to the testimony about why it was strange for Rodriguez to invite her sister for breakfast, we find no reversible error in its admission.

We overrule Mukherjee's thirteenth issue.

### State's Closing Argument

In issue fifteen, Mukherjee argues that the State impermissibly shifted the burden of proof to the defense when the prosecutor argued:

> [Mukherjee's] excuse of her coming from the bathroom doesn't explain how there is no hole in her blouse where the bullet hit her on the stomach and that there's stippling on her stomach, showing that her blouse was pulled up as she was shot in the stomach. You notice how both Mr. Kiernan and Mr. Stafford [defense counsel] both spoke to you. Neither one of them had any explanation for how that could have happened.

The trial court sustained defense counsel's objection to the shifting of the burden of proof and instructed the jury to disregard the prosecutor's comments, but

the trial court denied the defense's motion for a mistrial. The jury charge also instructed the jury that the "law does not require a defendant to prove his innocence or produce any evidence at all." An instruction to the jury to disregard improper jury argument cures the error unless the remark is "so inflammatory that its prejudicial effect could not reasonably be overcome by such an instruction." *Wilkerson v. State*, 881 S.W.2d 321, 327 (Tex. Crim. App. 1994) (en banc). This occurs where the improper argument is "extreme or injects new and harmful facts into the record." *Baker v. State*, 177 S.W.3d 113, 126 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Mukherjee does not contend that the prosecutor's argument falls into either of these categories. Given the fleeting nature of the comment and the instructions to the jury both at the time of the comment and in the written jury instructions, we cannot conclude that the instructions could not overcome the prejudicial effect of the comments. Accordingly, the trial court's instruction to the jury to disregard the prosecutor's allegedly improper jury argument cured any possible harm from the statement. We overrule Mukherjee's final issue.

## Conclusion

After a thorough review of the record and the applicable case law, we conclude that (1) the trial court did not err by denying Mukherjee's motion for directed verdict or instructing the jury on the charged offense; (2) the evidence was legally sufficient to sustain Mukherjee's conviction for capital murder; (3) the trial

court did not err in denying Mukherjee's motion to suppress his custodial statements, including those about the aggravated robbery; (4) the trial court did not err by admitting evidence of the extraneous aggravated robbery under Texas Rules of Evidence 404(b) and 403; (5) the trial court did not err in admitting the apartment complex surveillance video and still images; (6) the trial court did not err in admitting the photo arrays or permitting in-court identifications of Mukherjee; (7) the trial court's admission of the 911 call recording did not violate Mukherjee's Sixth Amendment right to confrontation, nor did its admission constitute reversible error under Texas Rules of Evidence 801 or 403; (8) the trial court did not err by permitting victim-impact testimony during the guilt-innocence phase of the trial; and (9) the trial court did not err by denying Mukherjee a mistrial after sustaining his objection to improper closing argument and instructing the jury to disregard it.

We affirm the judgment of the trial court.

Sarah Beth Landau
Justice

Panel consists of Chief Justice Radack and Justices Landau and Hightower.

Do not publish. TEX. R. APP. P. 47.2(b).